**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| WEST COAST LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, N.A., as Securities Intermediary; and DINA LOSH,<br><br>Defendants.<br><br>WELLS FARGO BANK, N.A., as Securities Intermediary,<br><br>Counterclaim-Plaintiff,<br><br>v.<br><br>WEST COAST LIFE INSURANCE COMPANY,<br><br>Counterclaim-Defendant. | Civil Action No. 20-04350 (ZNQ) (DEA)<br><br>OPINION<br><br>(TO BE FILED UNDER TEMPORARY SEAL) |

**QURAISHI, District Judge**

This case arises from a dispute regarding the origins and legitimacy of a $1.5 million life insurance policy on the life of Miriam Waldman, who passed away in 2020. ECF No. 1. According to Plaintiff West Coast Life Insurance Company ("WCL"), the insurance policy is part of an unlawful stranger-originated life insurance ("STOLI") scheme, in which investors evaluated Ms. Waldman's longevity, paid the policy premiums through a loan Ms. Waldman had no

1

obligation to repay, and constructed a transaction by which they would ultimately acquire and benefit from the insurance policy. *Id.* Based on these contentions, WLC seeks a declaratory judgment against Wells Fargo Bank, N.A. ("Wells Fargo"), acting as Securities Intermediary for a third-party investor, that the life insurance policy lacks an insurable interest and is thus void *ab initio*. *Id.* WCL also asserts claims of fraud, negligent misrepresentation, and breach of contract against the insurance agent who initially facilitated the application for the policy, Dina Losh ("Losh"). *Id.* Wells Fargo counterclaims that WCL is in breach of contract by failing to pay the death claim on the life insurance policy and that, even if the insurance policy is void, WCL is obligated to refund the premium it has received on the policy. ECF No. 35.

Now, following extensive discovery, each of the three parties moves for summary judgment. ECF Nos. 75, 76, 79. The Court has carefully considered the parties' submissions in connection with the motions and decides the motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the motions for summary judgment are **DENIED** in their entirety.

I. <u>BACKGROUND AND PROCEDURAL HISTORY</u>

The factual circumstances surrounding this action, as revealed through discovery, are set forth in submissions of the parties in accordance with Local Civil Rule 56.1. *See* Dina Losh's Statement of Material Facts ("Losh SOMF"), ECF No. 75-7; Wells Fargo's Statement of Material Facts ("Wells SOMF"), ECF No. 76-2; WCL's Statement of Material Facts ("WCL SOMF"), ECF No. 79-2. Any disagreements among the parties as to the characterization of certain events are noted for clarity where necessary and appropriate.

A. **The HM Ruby Premium Finance Loan Program**

In or around 2005, Wayne Himelsein and Jason Mandel formed an investment fund known as HM Ruby.[1] WCL SOMF ¶ 1. Starting in approximately 2006, HM Ruby began raising funds from investors to deploy in the form of short-term premium finance loans collateralized by life insurance policies and personal guaranties from insureds[2] (the "Loan Program"). Wells SOMF ¶ 25. Premium financing allows insureds to borrow money to pay premiums on insurance policies they own, rather than paying out of pocket. *Id.* ¶ 8. Under the Loan Program, HM Ruby made premium finance loans on life insurance policies with sufficient financial value, calculated based upon the insured's life expectancy and the policy's anticipated value in the life settlement market, a regulated market on which insurance policies are sold. *Id.* ¶ 27. After identifying seniors who met HM Ruby's valuation requirements, HM Ruby would facilitate the creation of a trust to serve as the borrower. WCL ¶¶ 7–10. The trusts were administered by trustees selected and paid for by HM Ruby, including attorney Sandor Krauss. *Id.* ¶ 11. The trusts then applied for life insurance policies and, once the policies were issued, HM Ruby would lend money to the trusts to pay the premiums to fund the policies. *Id.* ¶¶ 12–13.

According to Himelsein, from a regulatory standpoint and on advice from counsel, it was important that HM Ruby was not offering loans on policies that had not already been issued. ECF

---

[1] The HM Ruby Organization included the following affiliated entities: HM Ruby, LP; Himelsein Mandel Capital, LLC; the Himelsein Mandel Fund Management, LLC; and Quantlife, LLC. WCL SOMF ¶ 1.

[2] As explained *infra* in the context of the loan provided by HM Ruby to finance the insurance policy on Miriam Waldman's life, WCL contends that the personal guarantee was a mere formality. WCL SOMF ¶ 16. This is because HM Ruby also had a practice of entering into "Put Agreements," by which the loan beneficiaries could force HM Ruby to buy the life insurance policies after the contestable periods expired for an amount equal to the total amount due on the loan. *Id.* ¶ 16. WCL points to the "Put Agreements" as evidence that the loans were effectively non-recourse loans from which the insureds could walk away after the contestable period on the relevant policy expired. *Id.* ¶ 17.

3

No. 95-2 at 77:5–16.[3] Further, according to Himelsein, in 2007, HM Ruby did not intend to acquire the policies it funded on the secondary market, but rather the business model was to earn interest income from the premium finance loans.[4] Wells SOMF ¶¶ 28–29. However, due to the 2008 financial crisis, many borrowers declined to repay their loans and the life settlement market, which had previously provided a liquid market for sale of life insurance policies, crashed. *Id.* ¶ 30. Saddled with defaulted loans on policies which could not be sold for the balance of the loan, HM Ruby stopped making premium finance loans and adapted its business strategy to acquiring policies on the open market as a long-term investor, hoping that the valuations of the policies would ultimately rebound. *Id.* ¶¶ 30–31.

### B. The Policy and the HM Ruby Loan

In 2007, Miriam Waldman was 77 years old, living in Brooklyn, New York with her husband, Joseph. WCL SOMF ¶ 31. The Waldmans had previously owned a jewelry tools business in Manhattan and had one daughter, Chantzie Annette Waldman (now "Meth"), who had three children of her own. *Id.* ¶¶ 27–28, 37. As a part of their estate planning, that year, the Waldmans created the Waldman Family Trust, into which they put substantially all of their assets—including $400,000 in cash and their personal residence in Brooklyn—for the benefit of

---

[3] Citations to WCL Exhibits refer to the complete Exhibit list submitted in support of its motion for summary judgment. ECF No. 95.

[4] WCL disputes HM Ruby's intent with respect to the insurance policies it funded, pointing to testimony from Himelsein explaining that although HM Ruby had initially figured it would acquire approximately 30% of the policies, in reality, around 90% of the policies in the Loan Program were ultimately transferred to HM Ruby. WCL SOMF ¶¶ 23–24.

their daughter and grandchildren. *Id.* ¶¶ 37–38. Aside from the Waldman Family Trust, the financial status and wellbeing of Miriam and Joseph Waldman in 2007 is disputed.[5]

On September 11, 2007, Miriam Waldman submitted an application for credit to HM Ruby under the Loan Program. Wells SOMF ¶ 7. Then, on October 1, 2007, Ms. Waldman signed a Declaration of Trust creating another trust, the Miriam Waldman 2007 Life Insurance Trust (the "Trust"), with attorney Sandor Krauss serving as the trustee and her daughter named as the lone beneficiary. WCL SOMF ¶ 61; ECF No. 95-17; Wells SOMF ¶ 9. Despite serving at the trustee, Sandor Krauss never met or communicated with the Waldmans, nor did the Waldmans select or provide any sort of instruction to Sandor Krauss. WCL SOMF ¶ 62. Instead, Sandor Krauss was selected and paid by HM Ruby. *Id.* ¶ 63.

On October 9, 2007, a formal application for a $1.5 million life insurance policy, insuring Miriam Waldman, was submitted to WCL. *Id.* ¶ 65; Wells SOMF ¶ 1. The proposed beneficiary was listed as the Trust, with an address in Lakewood, New Jersey. WCL SOMF ¶ 66. The application reflects that it was signed by Ms. Waldman, Sandor Krauss, and the insurance broker, Ms. Losh. *Id.* ¶ 67. Ms. Losh worked for a company known as Rand Group Brokerage and was licensed to write life insurance policies in the states of New York and New Jersey. Losh SOMF ¶¶ 1–2. According to Ms. Losh, it was her practice to fill out life insurance policy applications on behalf of the insured while in his or her presence, explaining each of the questions and recording the appropriate answers. *Id.* ¶ 7. In connection with the application for the insurance policy, Ms. Losh also completed an Agent's Report, which indicated that Ms. Losh was unaware of any

---

[5] WCL highlights Ms. Meth's testimony that the Waldmans lived a "modest" lifestyle in 2007, "definitely were not wealthy," and were living "frugally." WCL SOMF ¶¶ 34, 36. Wells Fargo downplays the value of this isolated testimony, as Ms. Meth also indicated she was unfamiliar with the financial details regarding the successfulness of her father's business and generally unaware of the details regarding the Waldmans' estate planning. Wells Opp'n at 28–34. Wells Fargo also notes that Ms. Meth testified her mother's family "were well-to-do," ECF No. 95-4 at 19:15–17, and that in 2019 the Waldmans' Brooklyn home ultimately sold for $1.6 million, *id.* at 46:2–11.

premium financing associated with the insurance policy or plans to transfer ownership of the policy to an entity associated with stranger-owned or investment-owned life insurance. Wells SOMF ¶ 2.

On October 18, 2007, WCL issued a $1.5 million life insurance policy on the life of Ms. Waldman to the Trust (the "Policy"). WCL SOMF ¶ 68. The planned annual premium for the Policy was $54,000. *Id.* ¶ 69.

On October 22, 2007, HM Ruby approved Ms. Waldman's application for credit and entered into a Credit Agreement with the Trust as the borrower and Ms. Waldman as the obligor. Wells SOMF ¶ 14. Under the Credit Agreement, HM Ruby agreed to loan $138,210 to the Trust to pay premiums on the Policy for a period of 25 months, with an option for HM Ruby to extend the final maturity date. *Id.* ¶¶ 15–16; WCL SOMF ¶ 72. The Trust granted HM Ruby a security interest in the Trust's rights to and interest in the Policy. Wells SOMF ¶ 17. Ms. Waldman also personally guaranteed the Trust's obligation to repay the loan. *Id.* ¶ 18; ECF No. 76-17; WCL SOMF ¶ 74. Additionally, that same day, the Trust and HM Ruby entered into a "Put Agreement," under which, for $45,000, the Trust was provided a one-time option to cause HM Ruby, or one of its affiliates, to buy the Policy from the Trust in an amount equal to the premium on the Policy, loan interest, and other expenses incurred under the loan.[6] Wells SOMF ¶ 21; ECF No. 76-19; WCL SOMF ¶ 75; ECF No. 95-24. The Put Agreement operated to offset the risk that, in the event the Trust and Ms. Waldman decided to sell the Policy when the loan matured and use the proceeds

---

[6] With respect to the Put Agreement, the Waldmans also signed a Consent and Acknowledgment Agreement, which explained that the New York Insurance Department had issued an opinion in 2005 that concluded "that a recourse loan coupled with a put option strategy for the acquisition of a life insurance policy does not conform to the New York Insurance Law." WCL SOMF ¶ 80; ECF No. 95-25 at 1. HM Ruby consulted legal counsel regarding the opinion at the time it was issued, but concluded that, even if an insurance carrier contested policies procured through the Loan Program, the opinion was likely irrelevant as any premiums would likely be refunded. WCL SOMF ¶ 81. That 2005 opinion has since been rejected by the New York courts. *See Kramer v. Phoenix Life Ins. Co.*, 940 N.E.2d 535, 536–37 (N.Y. 2010) ("New York law permits a person to procure an insurance policy on his or her own life and immediately transfer it to one without an insurable interest in that life, even where the policy was obtained for just such a purpose.").

6

to pay the loan balance, the market price for the Policy would be less than the value of the loan, leaving Ms. Waldman with financial exposure under the personal guarantee signed in tandem with the Credit Agreement. Wells SOMF ¶ 22.

Following the execution of the loan, HM Ruby funded the Trust with $135,500. WCL SOMF ¶ 82. On October 30, 2007, Sandor Krauss, as the trustee, wrote a check drawn on the Trust's bank account to WCL in the amount of $54,000 for the Policy's first year premium. *Id.* ¶ 83. On November 7, 2007, WLC received that check and the Policy was made effective. *Id.* ¶ 86. One week later, the Trust paid HM Ruby the $45,000 for the put option. *Id.* ¶ 87.

### C. The HM Ruby Loan Matures and The Policy Is Sold

On October 26, 2009, HM Ruby agreed to extend the loan's final maturity date. Wells SOMF ¶ 35, ECF No. 76-20. On October 26, 2009, and again on April 14, 2010, the Trust borrowed an additional $45,203 and $24,992, respectively, from HM Ruby to pay premium on the Policy. WCL SOMF ¶¶ 90–91. The put option expired unexercised on November 17, 2009. Wells SOMF ¶ 36.

On October 19, 2010, the Trust sold the Policy to Quantlife, LLC, an HM Ruby affiliate, through a life settlement provider known as Lotus Life for $214,295.[7] WCL SOMF ¶ 92. That day, the Trust authorized Lotus Life to distribute $212,795 to HM Ruby in repayment of the loan and $1,500 to the Trust. Wells SOMF ¶ 49; WCL SOMF ¶ 93. As such, HM Ruby, through its affiliate Quantlife, obtained ownership of the Policy approximately three years after initially financing the premiums. WCL SOMF ¶ 95. Under the Life Settlement Agreement, Ms. Waldman and the Trust each represented that "[t]he Insured had a financial, investment or other planning

---

[7] The record indicates that, while the Policy was ultimately sold to Quantlife, Ms. Waldman and the Trust marketed the Policy for sale to potential purchasers through at least two life settlement brokers, including Life Distributors of America, LLC and Oxford Strategic Advisors. Wells SOMF ¶ 38.

7

purpose for causing the Seller to purchase the Policy and did not have any objective, intent, agreement or understanding to sell the Policy to any third party" and that "[t]he Seller purchased the Policy without either the Seller or the Insured having any objective, intent, agreement or understanding to hold the Policy for the benefit of any Person not having an insurable interest in the life of the Insured." Wells SOMF ¶ 48.

In connection with the life settlement of the Policy, on December 29, 2010, the Trust assigned ownership of the Policy to Wells Fargo, which acted as securities intermediary on behalf of Quantlife. ECF No. 76-34; ECF No. 77 ¶ 50. Then, in 2011, Quantlife sold the Policy to an investment fund known as Teleios LS Holdings, LLC ("Teleios"). WCL SOMF ¶ 98. Although the Policy was beneficially owned by Teleios, Teleios elected to keep Wells Fargo as securities intermediary and thus Wells Fargo paid premium to WCL from Teleios's funds. *Id.* ¶ 99.

In 2017, Teleios auctioned a portfolio of life insurance policies, including the Policy. *Id.* ¶ 107. VICOF II Trust ("VICOF"), an investment fund managed by Vida Capital and serviced by Magna Life Settlements, ultimately bid on and bought the portfolio. *Id.* ¶¶ 108, 118. The degree of insurable interest risk VICOF assigned to the portfolio and the Policy itself is disputed.[8] In total, VICOF, through Wells Fargo, paid WCL $102,890 in premium on the Policy. *Id.* ¶ 121. As the record Policy owner, Wells Fargo caused a total of $427,414.96 in premium on the Policy to be paid to WCL. Wells SOMF ¶ 51; ECF No. 76-37.

---

[8] WCL points to evidence indicating that VICOF was aware that the Policy had insurable interest issues at the outset and had designated the Policy a "moderate" insurable interest risk based on its creation through the HM Ruby Loan Program and the applicability of New Jersey law. WCL SOMF ¶¶ 111–12. Wells Fargo, relying upon the same evidence, contests that VICOF believed the Policy was an insurable interest risk merely because it was a HM Ruby premium-financed policy, noting that the moderate risk classification was the result of the Policy being governed by New Jersey law and that, after further consideration, VICOF's risk assessment of the Policy was revised to "low." Wells Opp'n at 71–73.

8

### D. The Death Claim

Ms. Waldman died on January 20, 2020. Wells SOMF ¶ 52. After obtaining a certified copy of Ms. Waldman's death certificate from the New Jersey Department of Health,[9] on February 6, 2020, Wells Fargo submitted a death claim on the Policy to WCL. WCL SOMF ¶¶ 125–26. WCL investigated Wells Fargo's death claim, concluding that the Policy was procured through suspected STOLI activity and likely lacked insurable interest under New Jersey law. *See* WCL SOMF ¶ 127; ECF No. 1 ¶ 28.

### E. Procedural History

On April 15, 2020, WCL commenced the present action, seeking a declaratory judgment that the Policy is void *ab initio* for lack of insurable interest and asserting claims of fraudulent inducement, fraud, negligent misrepresentation, and breach of contract against Ms. Losh. ECF No. 1. On January 29, 2021, the Court denied Wells Fargo's motion to dismiss and motion to transfer to the Eastern District of New York.[10] ECF Nos. 24, 25. Subsequently, Wells Fargo filed counterclaims against WCL for breach of contract, unjust enrichment, promissory estoppel, and, in the event the Court declared the Policy void *ab initio*, seeking a refund of all premiums paid on the Policy. ECF No. 35.

Following a period of discovery, the parties all moved for summary judgment on July 29, 2022. First, Ms. Losh moved for summary judgment as to the claims asserted against her by WCL. ECF No. 75 ("Losh Mot."). WCL opposed the motion. ECF No. 86 ("WCL Losh Opp'n"). Ms. Losh filed a reply. ECF No. 92 ("Losh Reply"). Second, Wells Fargo moved for summary

---

[9] Joseph Waldman passed away in 2014. WCL SOMF ¶ 101. Following his death, Ms. Waldman continued to live in her Brooklyn home until she broke her hip in 2017. *Id.* ¶ 104. Ms. Waldman then relocated to a New Jersey apartment. *Id.* ¶ 105.

[10] This matter was originally assigned to Hon. Brian R. Martinotti, U.S.D.J., who issued the Opinion and Order as to Wells Fargo's motion to dismiss and motion to transfer. It was reassigned on July 2, 2021. ECF No. 34.

9

judgment as to WCL's claim that the Policy lacks an insurable interest and is void *ab initio*. ECF No. 76 ("Wells Mot."). WCL opposed the motion. ECF No. 85 ("WCL Wells Opp'n"). Wells Fargo replied. ECF No. 93 ("Wells Reply"). Third, WCL moved for summary judgment as to its lack of insurable interest claim and Wells Fargo's counterclaims. ECF No. 80 ("WCL Mot."). Wells Fargo opposed the motion. ECF No. 83 ("Wells Opp'n"). WCL replied. ECF No. 94 ("WCL Reply").

## II.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson*, 477 U.S. at 248). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. The moving party bears the burden of showing that no "genuine issue" exists such that summary judgment is warranted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Once the movant adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004). Rather, "[a]ll facts and inferences are construed in the light most

favorable to the non-moving party." *Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. and N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994), *cert. denied*, 513 U.S. 811 (1994)). Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The court's role is "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. There can be "no genuine issue as to any material fact," however, if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23.

## III. DISCUSSION

The Court will first discuss the cross motions of WCL and Wells Fargo with respect to whether, under state law, the Policy lacks an insurable interest and, if so, whether any premium refund is warranted. Next, the Court will address Ms. Losh's motion for summary judgment as to the claims asserted against her by WCL. As set forth in more detail below, key facts underpinning the legal claims set forth in this action are fiercely disputed among the parties. These genuine disputes of material facts preclude summary judgment at this time.

### A. State Law Governing the Policy

As a preliminary matter, the Court must consider which state law—New York or New Jersey—governs the Policy for purposes of WCL's and Wells Fargo's summary judgment motions. To begin, the Court notes that, at the motion to dismiss stage, the Court stated that "the policy at issue here is governed by New Jersey law." ECF No. 32 at 6 (citing *Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.,* No. 14-5789, 2016 WL 5746352, at *8–9 (D.N.J. Sept. 30, 2016), *aff'd sub nom. Sun Life Assurance Co. of Canada v. Wells Fargo Bank NA*, 779 F. App'x 927 (3d Cir. 2019) (finding policy issued to a New Jersey trust and signed in New Jersey was governed by New Jersey law, despite the insured being domiciled in New York)). At this motion

11

for summary judgment stage, however, disputes of fact have arisen which make it necessary for the Court to evaluate the choice of law question in light of subsequent evidence.

Federal courts sitting in diversity apply the choice of law rules of the forum state. *See Gen. Star Nat'l Ins. Co. v. Liberty Mut. Ins. Co.*, 960 F.2d 377, 379 (3d Cir. 1992) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487 (1941)). "New Jersey has adopted the 'most significant relationship' test of the Restatement of Conflict of Laws." *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 718 (D.N.J. 2011) (citing *P.V. v. Camp Jaycee*, 197 N.J. 132, 142–43 (2008)). This analysis is a "two-step process." *Id.* First, the Court must "determine whether an actual conflict of law exists, for if no conflict exists, the law of the forum state applies." *Id.* Second, "if a conflict does exist, the Court must determine which state has the 'most significant relationship' to the claim, by 'weigh[ing] the factors set forth in the Restatement section corresponding to the plaintiff's cause of action.'" *Id.* (alteration in original) (quoting *Nikolin v. Samsung Elecs. Am., Inc.*, No. 10-1456, 2010 WL 4116997, at *3 (D.N.J. Oct. 18, 2010)).

Section 192 of the Restatement (Second) of Conflict of Laws addresses life insurance contracts, but is not determinative in this case. Section 192 states that a life insurance policy "issued to the insured upon his application" is governed by the laws of the insured's state of domicile when he applied. Restatement (Second) of Conflict of Laws § 192. However, this section "does not apply to life insurance issued upon the life of someone other than the applicant." *Id.* cmt. a. Instead, such policies must be evaluated looking to Section 188. *Id.* Here, the Policy was issued to the Trust, rather than to the insured, Miriam Waldman. WCL SOMF ¶ 66. Further, even if the policy was issued to the insured, Section 192 still requires a court to consider whether "some other state has a more significant relationship under the principles stated in § 6 to the transaction

and the parties." Restatement (Second) of Conflict of Laws § 192. Thus, the Court must look beyond Section 192.

For claims sounding in contract, courts look to Section 188 of the Restatement. *See Harper v. LG Electronics USA, Inc.*, 595 F. Supp. 2d 486, 489 (D.N.J. 2009). Section 188 offers various factors for courts to consider in the context of contract issues, including "(1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Snyder*, 792 F. Supp. 2d at 720 (quoting Restatement (Second) of Conflict of Laws § 6). "Additionally, courts look to the more general factors set forth in Section 6 of the Restatement: (1) interests of interstate comity, (2) interests of the parties, (3) interests underlying the field of law, (4) interests of judicial administration, and (5) competing interests of the states." *Id.* (citing Restatement (Second) of Conflict of Laws § 6).

Here, as Wells Fargo highlights, there is an actual conflict between New York and New Jersey law on the issue of the incontestability of insurance policies based on a lack of insurable interest. Wells Opp'n at 21–22. Under New York law, all life insurance policies contain a two-year incontestability clause, and "[a]n incontestability clause renders void any defense that the life insurance policy was invalid at its inception." *AEI Life, LLC v. Lincoln Benefit Life Co.*, 225 F. Supp. 3d 136, 145 (E.D.N.Y 2016) (quoting *Ganelina v. Pub. Adm'r, New York Cnty.*, 963 N.Y.S.2d 545, 548 (N.Y. Sup. Ct. 2013)) (noting that if a policy does not contain an incontestability clause, New York law "will imply one"); *see* N.Y. Ins. Law § 3203(a)(3). Thus, "a policy governed by New York substantive law cannot be voided for fraud or lack of insurable interest once the two-year contestability period has expired." *AEI Life*, 225 F. Supp. 3d at 145. On the other hand, under New Jersey law, a life insurance policy that lacks an insurable interest is

13

void *ab initio*—that is, "it is as though the policy never came into existence"—and may be challenged on such grounds beyond the contestability period. *Sun Life Assurance Co. of Can. v. Wells Fargo Bank, N.A.*, 238 N.J. 157, 187 (2019) (citing *D'Agostino v. Maldonado*, 216 N.J. 168, 194 n.4 (2013)). Therefore, if New York law were to govern the Policy, the present action would be subject to immediate dismissal, whereas under New Jersey law WCL may proceed with its claim for a declaratory judgment as to the Policy's purported lack of insurable interest.

Given that an actual conflict in the states' substantive law exists, the law of the state with the most significant relationship to the Policy governs. Two key facts in this analysis are disputed by the parties.

First, the parties dispute where the insurance policy application was signed. WCL argues that the application was signed in Lakewood, NJ, based on the place of signing that is handwritten on the application form. WCL Opp'n at 9; *see* ECF No. 95-18 at 5. However, as Wells Fargo observes, Sandor Krauss testified on deposition that he would have signed the application in New York. ECF No. 79-51 at 32:4–18.

Second, the parties dispute where the insurance policy was delivered. WCL argues that the policy was issued for delivery to the Trust's New Jersey address. WCL Opp'n at 5. Wells Fargo contends that the record developed through discovery now indicates the Policy was actually delivered in New York and that under both New York and New Jersey law, insurance policies are governed by the law of the state in which they are delivered. Wells Reply at 7 (citing N.Y. Ins. Law § 3103(b); N.J.S.A. § 17B:17-20); *see* ECF No. 83-2 ¶ 36–40.

Other factors do not weigh decisively in favor of either New York or New Jersey law to render these disputed facts irrelevant. The New York residence of the insured weighs in favor of New York law. *See* WCL SOMF ¶ 31; Restatement (Second) of Conflict of Laws § 188; Wells

Opp'n at 22. The New Jersey address of the Trust weighs in favor of New Jersey law. ECF No. 83-1 at 49; Restatement (Second) of Conflict of Laws § 188; WCL Opp'n at 5. Wells Fargo argues that the situs of the Trust is New York, ECF No. 83-1 at 50, weighing in favor of New York law. WCL notes that the Trust represented itself as having a situs in New Jersey in the application, WCL Opp'n at 9, weighing in favor of New Jersey law applying based on the expectations of the parties.

The Court finds that resolving the disputed facts is therefore necessary to decide the choice of law question, which precludes granting summary judgment in favor of either WCL or Wells Fargo regarding whether the Policy lacks an insurable interest.[11]

### B. Losh's Motion for Summary Judgment

Separately, Ms. Losh moves for summary judgment as to WCL's claims of fraudulent inducement, fraud, negligent misrepresentation, and breach of contract. *See generally* Losh Mot. Specifically, Ms. Losh argues that WCL has failed to identify any evidence to support its contention that Ms. Losh participated in a fraudulent STOLI scheme or otherwise knowingly misrepresented facts in the application for the Policy. *Id.* at 1. Ms. Losh contends, to the contrary, that "all of the information contained in the application was complete and true" based on her knowledge at the time. *Id.* at 3. Further, Ms. Losh asserts that WCL's causes of action are time-barred because WCL should have discovered the alleged fraudulent scheme in 2010, when it received a payment indicating that the Policy had been premium financed. *Id.* at 4–6.

---

[11] Wells Fargo contends that it is entitled to summary judgment even if the less favorable New Jersey law governs. Wells Reply at 6. Despite Wells Fargo's arguments to the contrary, the Court finds that the record raises sufficient factual questions that require consideration by a factfinder, including whether HM Ruby procured or caused to be procured the Policy, and Ms. Waldman's intended purpose for the Policy. *See Sun Life*, 238 N.J. at 190.

In opposition, WCL contends that a reasonable juror could conclude that, based on the record evidence, Ms. Losh misrepresented material facts in connection with the application for the Policy, including whether the Policy was premium financed. WCL Losh Opp'n at 25–32. Further, WCL argues that a reasonable juror could conclude that Ms. Losh's conduct amounted to a breach of the contract she had with WCL as an insurance agent. *Id.* at 10–25. As to Ms. Losh's argument that WCL's claims are time barred, WCL asserts that the applicable limitations periods for the causes of action were tolled until early 2020, when WCL first learned of the origins of the Policy. *Id.* at 1–2.

### 1. The Tort Claims (Fraudulent Inducement, Fraud, & Negligent Misrepresentation)

To establish a claim for fraud under New Jersey Law, a plaintiff must show: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Caspersen v. Oring*, 441 F. Supp. 3d 23, 34 n.3 (D.N.J. 2020) (quoting *Suarez v. E. Int'l Coll.*, 428 N.J. Super. 10, 28 (App. Div. 2012)). The elements of a claim for fraudulent Inducement are the same. *See RNC Sys. Inc. v. Modern Tech. Grp., Inc.*, 861 F. Supp. 2d 436, 451 (D.N.J. 2012) ("In order to establish a claim for fraudulent inducement, five elements must be shown: (1) a material representation of a presently existing or past fact; (2) made with knowledge of its falsity; and (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment.").

Here, WCL points to evidence in the record that raises a genuine dispute as to whether Ms. Losh knowingly misrepresented aspects of the Policy application to WCL. Specifically, Ms. Losh represented in the accompanying Agent Report that the Policy was not premium financed, see ECF No. 95-18 at 5, when, in fact, Ms. Waldman financed the Policy through a loan, WCL SOMF

16

¶¶ 87, 90–91. According to Ms. Losh, it was her practice to fill out policy applications on behalf of insureds and to carefully explain each of the questions associated with the application. Losh SOMF ¶ 7. Ms. Losh also testified that she would typically discuss with insureds how they would pay the premiums on a policy. ECF No. 95-66 at 59:15–60:3. Based on this circumstantial evidence, a reasonable juror could conclude that Ms. Losh knowingly made a material misrepresentation to WCL, when she indicated to WCL that the Policy was not premium financed. In addition, because the net worth of the Waldmans at the time of the Policy application is in dispute, there exists a genuine issue as to whether Ms. Losh misrepresented Ms. Waldman's financial qualifications for the $1.5 million Policy. *See* WCL Losh Opp'n at 4. Accordingly, summary judgment as to WCL's fraud claims will be denied.

For the same reasons, summary judgment as to WCL's claim for negligent misrepresentation is precluded. "To state a claim for negligent misrepresentation, a plaintiff must show '(1) an incorrect statement, (2) negligently made, (3) upon which plaintiff justifiably relied, and (4) resulted in economic loss or injury as a consequence of that reliance.'" *Noble v. Samsung Electronics Am., Inc.*, No. 15-3713, 2018 WL 801590, at *5 (D.N.J. Feb. 8, 2018) (quoting *Mason v. Coca–Cola Co.*, 774 F. Supp. 2d 699, 704 (D.N.J. 2011)). Even if WCL cannot show that Ms. Losh knowingly made any misrepresentations, a reasonable juror might conclude that the identified inaccuracies associated with the application were negligent.

### 2. Breach of Contract

"Under New Jersey law, the elements of a breach of contract are that: (1) The parties entered into a valid contract; (2) the defendant failed to perform its contractual obligation; and as a result (3) the plaintiff sustained damages." *Accurate Abstracts, LLC v. Havas Edge, LLC*, No. 14-1994, 2015 WL 5996931, at *4 (D.N.J. Oct. 14, 2015) (citing *Sheet Metal Workers Int'l Ass'n Local Union No. 27, AFL–CIO v. E.P. Donnelly, Inc.*, 737 F.3d 879, 900 (3d Cir. 2013)).

Both WCL and Ms. Losh agree that she was bound by the terms of a contract called the Independent Agent's Agreement, which Ms. Losh signed on October 9, 2007. ECF No. 95-73 at 1; Losh Reply at 7. Pursuant to that contract, Ms. Losh agreed "to comply with all statutory laws, rules, regulations, and company guidelines in the sale of these insurance products." ECF No. 95-73 at 1. WCL highlights that, prior to October 2007, it had issued several company guidelines regarding premium financed policies that required insurance agents to provide a full description of the proposed financing arrangement associated with a particular policy. WCL Losh Opp'n at 11–12. Whether Ms. Losh breached these guidelines, and therefore the Independent Agent's Agreement, largely depends upon whether WCL can prove that Ms. Losh was aware that the Policy was being financed by a loan. Because genuine issues of fact exist as to Ms. Losh's awareness of the Policy's financing at the time of application, summary judgment as to WCL's breach of contract claim is inappropriate.

### 3. Statute of Limitations

Ms. Losh also argues that WCL's causes of action are time barred because WCL was on inquiry notice that the Policy had been premium financed as early as 2010. Losh Mot. 4–6. Under New Jersey law, the applicable statute of limitations for claims of fraud, negligent misrepresentation, and breach of contract is six years. *See* N.J.S.A. § 2A:14-1. WCL contends that it did not have inquiry notice of its claims against Ms. Losh and that the "discovery rule" operates to delay accrual of the claims until 2020, when it received the death claim on the Policy. WCL Losh Opp'n at 22.

"The discovery rule is accepted in New Jersey as an exception to the six-year statute of limitations set forth in section 2A:14–1." *Kenney v. M2 Worldwide, LLC*, No. 12-1059, 2013 WL 592149, at *4 (D.N.J. Feb 13, 2013) (citing *Nix v. Option One Mortg. Corp.*, No. 05-3685, 2006 WL 166451, at *10 (D.N.J. Jan.19, 2006)). "Under the discovery rule, the accrual of a cause of

18

action is delayed until the injured party discovers, or by the exercise of reasonable diligence and intelligence should have discovered, that he may have a basis for an actionable claim." *Id.* (internal quotation marks omitted) (quoting *Nix*, 2006 WL 166451, at *10). "For the court to determine whether the plaintiff had objective inquiry notice of its injuries, the defendant must show the existence of storm warnings, meaning that any information or accumulation of data would alert a reasonable person to the probability that the defendant engaged in wrongdoing." *Id.* (internal quotation marks omitted) (quoting *Nix*, 2006 WL 166451, at *10). "If the defendant is successful, the burden shifts to the plaintiff for the second step, the subjective inquiry, to show that, 'heeding the storm warnings, they exercised reasonable diligence but were unable to find and avoid the storm.'" *Id.* (quoting *Cetel v. Kriwan Fin. Grp., Inc.*, 460 F.3d 494, 507 (3d Cir. 2006)).

Here, Ms. Losh challenges the applicability of the discovery rule, pointing to the fact that as early as 2010 WCL began receiving premium payments on the Policy from a party other than the Trust, following the sale of the Policy. Losh Moving Br. at 6. But the mere fact that a third party came to own the Policy in 2010 hardly proves that WCL was on inquiry notice that the Policy had been premium financed. As the New Jersey Supreme Court recognized in *Sun Life*, "[v]alid life insurance policies are assets that can be sold," and "[a]n established secondary market exists for the sale of valid policies." 238 N.J. at 185. Payment of the Policy premiums by a third party in 2010 indicates nothing more than a change in ownership consistent with this secondary market and cannot operate to bar application of the discovery rule with respect to WCL's causes of action. Accordingly, because Ms. Losh failed to show that WCL was aware, or should have been aware, that the Policy had been premium financed before its 2020 investigation in response to the death claim on the Policy, she has not met her burden as movant. Thus, Ms. Losh's motion for summary judgment will be denied in its entirety.

## IV.  CONCLUSION

For the reasons stated above, the three motions for summary judgment are **DENIED**.  An appropriate Order will follow.[12]

Date: **June 27, 2023**

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

---

[12] As a final, housekeeping matter, the Court notes that portions of this Opinion refer to certain documents and information that was placed under seal at the request of the parties.  The Court has therefore instructed the Clerk's Office to place this Opinion under temporary seal, and will order the parties to meet and confer and advise as to whether they will be filing an appropriate motion to seal under Local Civil Rule 5.1 to permanently seal this Opinion,